UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| COMCAST OF HOUSTON, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Civil Action No. |
| COLTON DEVELOPMENT COMPANY, LLC | ) ) ) ) |
| Defendant. | ) ) ) |

**ORIGINAL COMPLAINT**

Plaintiff Comcast of Houston, LLC ("Comcast") files this Complaint against Colton Development Company, LLC ("Colton").

**NATURE OF THE ACTION**

1. This case is about a developer unlawfully stifling competition and dictating which communications service providers are available to Texas homeowners and their families. In April 2024, Colton launched a 5,700-acre master-planned community in Montgomery County, outside of Houston, Texas ("Development"). Comcast, a cable operator, endeavors to provide competitive communications services to Texas residents. As part of that endeavor, Comcast began constructing its cable system in the public rights-of-way and public utility easements to serve the Development, as its franchise certificate, Texas law, and the Cable Communications Policy Act of 1984 ("Cable Act") authorize it to do. But in an illegal effort to artificially eliminate competition and consumer choice, Colton has prevented Comcast from installing its cable system, contending Colton alone controls which providers can deploy communications service facilities to residences in the Development.

2. Colton relies on purported "Covenant Easements," hidden in its Declaration of Covenants, Conditions, and Restrictions, to selectively restrict communications service providers' access to the public rights-of-way and public utility easements in the Development. The Covenant Easements—which Colton claims to control—run along the perimeter of each residential lot. This placement effectively operates as a private easement "moat" that prevents access to each residential property in the Development. Colton is using the Covenant Easements to control which communications service providers can serve the Development's future homeowners, binding residents to that restriction regardless of their preferences. The Covenant Easements bar Comcast from connecting its facilities from the public rights-of-way and public utility easements to requesting customers without Colton's permission. Colton has refused to grant such permission to Comcast. Further, Colton has used the Covenant Easements to prevent Comcast from accessing the public rights-of-way and public utility easements in the first instance to construct its facilities.

3. Colton's efforts to restrict and eliminate competition for communications services violate the Cable Act, 47 U.S.C. §§ 521-573, which protects and promotes competition in cable communications. The Cable Act expressly authorizes franchise holders, like Comcast, to access rights-of-way and utility easements in order to provide cable service and other services to customers, and forbids private arrangements that restrict such access.

4. The Cable Act and multiple federal court decisions, including a recent Utah decision addressing a similar situation, unequivocally prohibit Colton's efforts as unlawful.

5. Under 28 US.C. §§ 2201 and 2202, Comcast seeks declaratory relief and a permanent injunction. Comcast also seeks monetary damages for violations of the Cable Act and the Texas Utilities Code caused by Colton's unlawful efforts to exclude Comcast from providing competitive services in the Development.

## PARTIES

6. Plaintiff Comcast of Houston, LLC is a limited liability company registered in the State of Texas. Its principal place of business is 8590 W. Tidwell Rd., Houston, Texas 77040. It is a licensed cable operator authorized by a franchise certificate issued by the Public Utility Commission of Texas ("PUCT") to operate its cable systems in the unincorporated areas of Montgomery County to provide cable, broadband, voice, and other communications services to residential and commercial subscribers.

7. Defendant Colton Development Company, LLC is a limited liability company registered in the State of Texas. Its principal place of business is 19350 State Highway 249, Ste. 210, Houston, Texas 77070. It may be served through its registered agent Debra M. Gilbreath at 2700 Post Oak Blvd., Suite 1750, Houston, Texas 77056.

## JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. § 1331 because this case seeks declaratory and equitable relief under 28 U.S.C. §§ 2201 and 2202 and turns on the resolution of questions under federal law, namely the Cable Act.

9. The Court has supplemental jurisdiction over Comcast's state law claim pursuant to 28 U.S.C. § 1367.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

**A. Comcast Provides Competitive Communications Services in Texas**

11. Comcast is a franchised cable operator across Texas, including in Montgomery County. Comcast accordingly invests in the deployment of cable systems, comprised of wires,

cables, and other communications network infrastructure (commonly called "facilities" or its "cable system") to serve Texas residents.

12. Comcast's cable facilities include wire connections from Comcast's main network, typically in public rights-of-way and easements, to the premises of requesting customers (known as "customer drops"). Serving customers using its own facilities in this manner is commonly known as providing "facilities-based" communications services to customers. *See, e.g.*, *Promotion of Competitive Networks*, 15 FCC Rcd. 22983, 22987 (2000) (finding that "the greatest long-term benefits to consumers will arise out of competition by entities using their own facilities," because "such facilities-based competition" ensure that carriers cannot "exert bottleneck control over essential inputs, but will compete on a more equal basis with their rivals").

13. Comcast's cable franchise authorizes it to construct and operate its cable systems in public rights-of-way and utility easements across Texas. Tex. Util. Code § 66.002(5), (8). In 2006, Comcast's franchise certificate was amended to authorize Comcast to deploy cable systems in public rights-of-way and public utility easements located in the unincorporated areas of Montgomery County. In 2022, the franchise certificate was amended to include the City of Todd Mission and Grimes County and, in 2024, was amended to include the unincorporated areas of Walker County.

**B. Colton's Attempts to Create Exclusive Easement Arrangements**

14. In 2024, Defendant Colton began construction of the Development. It spans more than 5,700 acres and is advertised to be "the largest development the area has seen with a build out value estimated at $9.9 billion."

15. The Development contains utility easements, including 16-foot-wide utility easements that run through the front boundary of each lot and 10-foot-wide utility easements that run along the side boundary of certain lots adjacent to the street. There is also a 50-foot-wide right-

of-way along each internal street in the Development. A true and correct copy of a representative plat in the Development is attached as Ex. A. The utility easements and rights-of-way are denoted on the plat map as "U.E." and "R.O.W," respectively:



16. Colton dedicated all streets and easements in the Development to public use. The rights-of-way and utility easements are thus *public* rights-of-way and *public* easements, which should be accessible by Comcast.

17. Colton also attempted to create *private* easements for certain purposes—under its exclusive control—in its First Amended Declaration of Covenants, Conditions, and Restrictions for Colton, which was recorded with the Montgomery County Clerk on April 3, 2025.

18. These private easements—styled as "Covenant Easements"—purport to reserve to Colton and its designees exclusive rights to undertake certain types of activity on each lot:

> [A]ccess and maintenance easements and rights of way across each Lot are expressly reserved to [Colton] and its designees in, over and under the Covenant Easements (defined below) for the following purposes: . . . The installation, construction, repair, replacement and

>  maintenance of . . . wires, lines, conduits, and the necessary or proper attachments in connection with the transmission of electricity, telephone, cable television systems, community antenna television cables, Wi-Fi systems, monitoring and similar systems, and other utilities and similar facilities . . . . Subject to any rights dedicated to the public, [Colton] reserves all rights in and to the right of way of any public street or road located within, or which may be located on or adjacent to the Property[.]

19. The covenants define these "Covenant Easements" as "those strips of land within each Lot 16 feet in width along the entire distance of the front boundary of the Lot; 10 feet in width along the entire distance of the rear boundary of the Lot; and 5 feet in width along the entire distance of each side boundary of the Lot."

20. The Covenant Easements thus effectively create a private easement "moat" surrounding each residential premises, such that communications service wires, lines, conduits, and related facilities cannot be connected from the public rights-of-way and public utility easements to any residential premises without Colton's permission.

21. The purported Covenant Easements also directly overlap with the public utility easements on the front boundary on each residential lot.

22. The effect of the Covenant Easements is to provide Colton with the exclusive right to dictate which communications service providers can deploy communications service facilities from the public rights-of-way and public utility easements to residential premises in the Development to provide facilities-based services.

23. Colton has used the Covenant Easements to selectively restrict such access, thereby artificially restricting facilities-based competition in the Development and harming residents by denying them the competitive choice the marketplace would otherwise provide.

**C. Comcast Attempts to Construct its Cable System in the Colton Development**

24. In July 2025, Comcast, through its contractor and system design team, began work to construct its cable system in the public rights-of-way and public utility easements in the Development to provide its communications services to residents.

25. But beginning in July 2025, Colton undertook efforts to restrict Comcast's access to these public rights-of-way and public utility easements, relying on its purported "Covenant Easements" to prevent Comcast from constructing its cable system.

26. On July 23, 2025, Colton sent a letter to Comcast claiming that Comcast did not have the right to access the purported private "Covenant Easements." Colton stated that it would not allow Comcast to install its cable system in these easements now or ever. Ex. B.

27. Specifically, in the July 23 letter, Colton informed Comcast that it had been "made aware of Comcast's . . . intent to access Colton and install a fiber system within the platted boundaries of the lots within Colton, and more specifically, within the covenant easements held by Declarant and located on these lots." *Id.* Colton thus explained the letter was "formal notice" that it "ha[d] not designated, nor will it designate in the future, Comcast (or its designees) as permitted entities regarding the use of the covenant easements located on the lots within Colton for the purpose of establishing a fiber system." *Id.* Colton expressed its intent to "pursue all legal remedies available to it in law or in equity to protect its covenant easements" in the event Comcast accessed the easements. *Id.*

28. On August 15, 2025, Comcast informed Colton of its rights to access public rights-of-way under its franchise certificate. Ex. C. Comcast requested that Colton provide the statutory basis on which it relied to exclude Comcast from the Covenant Easements.

29. On August 22, 2025, Colton responded to Comcast claiming that it was not restricting Comcast's access to the public rights-of-way—only to the private Covenant Easements

on the residential lots. Ex. D. Colton explained that the Covenant Easements "are privately held by [Colton] and located within Lots." *Id.* Colton did not provide a legal basis for its attempt to exclude Comcast but instead reiterated its position that its Declaration of Covenants, Conditions, and Restrictions restricted access to the Covenant Easements, emphasizing that Colton "ha[d] already provided Comcast with formal notice that [Colton] has not designated, nor will it designate in the future, Comcast (or its designees) as permitted entities regarding the use of the covenant easements located on the lots within its community for the purpose of establishing a fiber system." *Id.*

30. Colton likewise sent a cease-and-desist letter to Comcast's contractor, Sammons Construction Co., Inc., wherein Colton claimed that neither Comcast nor its designees had the right to access the Covenant Easements and demanded that Sammons immediately cease and desist all attempts to access them. Ex. E. Colton noted that "[i]t ha[d] come to [Colton's] attention that Sammons Construction Company ("Sammons") has been instructed (by Comcast) to enter the Colton community, access privately held Covenant Easements, begin installing fiber, and perform various other construction work." *Id.* Colton thus "inform[ed] Sammons that Sammons does not have permission to access the privately held Covenant Easements for any reason at this time" and instructed Sammons to "immediately cease and desist any and all attempts to access the Covenant Easements." *Id.*

31. Despite Colton's claim that it is not preventing Comcast's right to access the public rights-of-way, Colton's purported exclusive easements have precisely that effect. When Colton demanded that Comcast cease constructing its facilities, Comcast's contractors were attempting to access the joint utility trench—not residential lots. The joint utility trench is located in the public rights-of-way and/or public utility easements and allows multiple utilities and communications

providers to construct their facilities in a single excavation. Even though Comcast had not encroached on the residential lots, Colton demanded that Comcast immediately cease and desist its operations in the Development, citing Comcast's intent to access the Covenant Easements. Colton has thus directly prevented Comcast from accessing the public rights-of-way and public utility easements to construct its cable system in the joint trench alongside other utilities and communications service providers.

32.　　Even if Colton permits Comcast access to the joint trench, the purported Covenant Easements prevent Comcast from making meaningful use of the public rights-of-way and public utility easements. By refusing to permit Comcast to cross its purported Covenant Easement "moat" to install customer drops connecting residences to Comcast's facilities in the public rights-of-way and public utility easements, Colton has prevented Comcast from using the public rights-of-way and public utility easements to construct and operate a cable system to provide facilities-based cable service and other communications services to the Development's residents. Without the ability to cross the moat to install these customer drops, Comcast cannot use the public rights-of-way and public utility easements to provide telecommunications, multichannel video, or other services to customers in the Development who wish to use its franchised cable system.

33.　　Further, by purporting to create "Covenant Easements" that directly overlap with the utility easements on each residential lot, Colton has attempted to privatize the public utility easements on the residential lots with respect to the deployment of communications service facilities. Because Colton has created private easements coterminous with the length of the public utility easements along the front boundary of each residential lot, Colton has restricted Comcast's access to the public utility easements for the deployment of communications service facilities in the Development.



34.     Colton's efforts to restrict access to and use of public rights-of-way and public utility easements operate as a direct barrier for cable operators and other communications service providers seeking to offer services to the Development's residents. By cordoning off these residential lots, Colton has effectively restricted such access and use to only those providers it approves, preventing any meaningful use of the public rights-of-way and public utility easements by any other provider.

35.     Comcast understands that Colton has entered into a private arrangement with a competing communications service provider, by which Colton receives compensation to market the competitor's services, including giving it the exclusive right to provide broadband, video, and/or other communications services to Colton residents. Colton requires residents to purchase their lots subject to these restrictive easements. By creating the purported Covenant Easements, expressly reserving to itself the sole right to determine access to those easements, and permitting access to only one communications services provider, Colton has effectively eliminated competition for cable and other services within the Colton development.

36. The implications of Colton's scheme extend beyond Comcast's attempts to provide cable services. By creating a "moat" along the perimeter of each lot in the Development and claiming it alone has the right to determine access to the moat, Colton can dictate the sole provider for a variety of services—a determination that Colton residents are powerless to challenge. For example, Colton could enter into an exclusive agreement for the provision of services with an alarm company and refuse to permit competitors access to residential lots to connect their services to residents' homes. Similarly, Colton could confer the right to cross the Covenant Easements to provide services to Colton residents to only one landscaping company, or contractor, or any other service provider that needs to cross the perimeter of a residential lot. The purported Covenant Easements thus empower Colton to, for the right price, eliminate competition for any number of service providers within its development.

### D. The Cable Act Prohibits Colton's Conduct

37. Colton's efforts to stifle competition for cable, broadband, telecommunications, and other communications services in Montgomery County violate the Cable Act.

38. In 1984, Congress enacted the Cable Act as Title VI to the Communications Act of 1943. *See* 47 U.S.C. §§ 521-573. A principal purpose of the Cable Act is to "promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. § 521(6).

39. The Cable Act requires a cable operator to obtain a franchise from the relevant cable franchising authority before providing cable service. 47 U.S.C. § 541(b)(1).

40. In Texas, the PUCT is the relevant cable franchising authority. The PUCT issues a State-Issued Certificate of Franchise Authority to entities providing cable or video services within the State of Texas.

41. The Cable Act mandates that "[a]ny franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses." 47 U.S.C. § 541(a)(2).

42. Consistent with the Cable Act's pro-competition objectives, in 1992, Congress amended the Act "to encourage more robust competition in the local video marketplace . . . [by] forbid[ding] local franchising authorities from unreasonably denying a franchise to potential competitors who are ready and able to provide service." *Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1983 as Amended by the Cable Television Consumer Protection and Competition Act of 1992*, 22 FCC Rcd. 5101, 5132 (2007) (citing, inter alia, H.R. Rep. No. 102-627, at 47 (1992); S. Rep. No. 102-92, at 47 (1991)); *see* 47 U.S.C. § 541(a)(1) ("[A] franchising authority may not grant an exclusive franchise and may not unreasonably refuse to award an additional competitive franchise.").

43. The Cable Act not only expressly authorizes franchised cable providers to access public rights-of-way and easements to construct their cable systems, but also "forbid[s] any private agreements that would prevent a cable franchise from using dedicated utility easements." *Centel Cable Television Co. of Florida v. Thomas J. White Dev. Corp.*, 902 F.2d 905, 909 (11th Cir. 1990). Any private arrangement that limits a franchised cable operator's "right of passage to and from" a utility easement violates the Cable Act. *Id.*; *accord San Juan Cable LLC v. Puerto Rico Tel. Co.*, 612 F.3d 25, 30 (1st Cir. 2010) ("Once a cable operator receives a franchise, it enjoys the right to build a cable system over public rights-of-way and through compatible easements. It may then *provide cable service* in the franchised area.") (emphasis added).

44. Consistent with these statutory provisions and judicial decisions, and as courts have explicitly held, the Cable Act prohibits "moats" like the ones Colton has created here. *See generally Comcast of California/Massachusetts/Michigan/Utah, LLC v. FirstDigital Commc'ns, LLC*, 2025 WL 2781576 (D. Utah Sept. 30, 2025). In addressing a substantially similar attempt to limit franchised cable operators' use of public utility easements, the court in *FirstDigital* found that "a private easement" that is "placed and used in a manner to allow selective access to and use of a dedicated public utility easement" violates the Cable Act to the extent its effect is to deny such access and use to a franchised cable operator. *Id.* at *4. There, an incumbent communications service provider purported to possess two-foot-wide private easements situated between a public utility easement and each residential lot, effectively creating a "moat"; and the incumbent provider refused to allow Comcast to install customer drops across that moat to connect its facilities in the public utility easement to residential premises. *Id.* at *3. The court concluded that the incumbent provider's use of its purported private easements was an unlawful attempt "to creatively circumvent the Cable Act's requirement that any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses." *Id.* at *4; *see also id*. (holding that, although Comcast was able to deploy facilities in the public utility easement itself, "th[at] access is meaningless because the private easement asserted by [the incumbent provider] prevents [Comcast] from connecting its [cable system] to any residence from the [public utility easement], thereby preventing [Comcast] from meaningful *use* of the [public utility easement].")

45. The Cable Act also "forbid[s] any private agreements that would prevent a cable franchise from *using* dedicated utility easements." *Id.* Accordingly, a private agreement that does

- 13 -

not directly prevent access to a public right-of-way or utility easement but nevertheless prevents a cable franchise from engaging in "meaningful use" of the right-of-way or easement violates the Cable Act.

## CAUSES OF ACTION

### COUNT I:
### Declaratory and Injunctive Relief under 28 U.S.C. §§ 2201 and 2202

46. Comcast re-alleges and incorporates by reference paragraphs 1-45.

47. A primary purpose of the Cable Act is to "promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems." 47 U.S.C. § 521(6).

48. The Cable Act provides that "[a]ny franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which is within the area to be served by the cable system and which have been dedicated for compatible uses." 47 U.S.C. § 541(a)(2).

49. In enacting the Cable Act, Congress made clear that "[a]ny private arrangements which seek to restrict a cable system's use of such easements and rights of way which have been granted to other utilities are in violation of this section and not enforceable." H.R. Rep. 98-934, 59, 1984 U.S.C.C.A.N. 4655, 4696.

50. Congress also clarified that easements dedicated for compatible uses includes "an easement or right-of-way dedicated for electric, gas or other utility transmission." *Id.*

51. Comcast deploys "cable systems" as defined by the Cable Act. *See* 47 U.S.C. § 522(7).

52. Comcast operates its cable systems to provide, among other communications services, "cable service" as defined by the Cable Act. *See* 47 U.S.C. § 522(6).

53. Comcast is a "cable operator" under the Cable Act. *See* 47 U.S.C. § 522(5).

54. Comcast has been granted a franchise certificate by the PUCT, and that franchise, as amended, authorizes Comcast to construct and operate a cable system in public rights-of-way and public utility easements throughout the unincorporated areas of Montgomery County, which includes the Development.

55. The public utility easements in the Development are "dedicated for compatible uses" under the Cable Act because they allow for facilities to be deployed by public utilities, including electric, gas, water, and other utilities.

56. Comcast has the right under the Cable Act and its franchise certificate to install its cable system in public rights-of-way and public utility easements and to connect its cable system across the property of a requesting customer to provide service to that customer.

57. Colton has unlawfully restricted Comcast's use of the public rights-of-way and public utility easements by preventing Comcast from constructing its facilities in the joint trench located in the public rights-of-way and/or public utility easements.

58. Colton has further unlawfully restricted Comcast's use of the public rights-of-way and public utility easements by purporting to create private easements that operate as a moat preventing Comcast from connecting its cable system to customer homes without Colton's permission, which Colton has withheld.

59. Colton's attempts to use its private easements to prevent Comcast from both constructing its facilities in the joint trench in the public rights-of-way and utility easements and connecting its cable system from the public rights-of-way and public utility easements across a customer's property are contrary to and violate the Cable Act.

60. Comcast is authorized by the Cable Act and its franchise certificate to construct and operate its cable system in the public utility easements and to connect its cable system to residential premises.

61. Comcast cannot access the public utility easements on the residential lots without crossing Colton's purported Covenant Easements. By denying Comcast permission to cross these purported private easements, Colton has restricted Comcast's access to the public utility easements.

62. Colton's efforts to use the Covenant Easements to prevent Comcast from accessing the public utility easements are contrary to and violate the Cable Act.

63. Comcast is entitled to a declaratory judgment that its rights under the Cable Act authorize it to construct its cable system in the rights-of-way and utility easements and to connect to customer homes from those rights-of-way and utility easements.

64. Comcast is also entitled to injunctive relief prohibiting Colton from taking any action that would seek to prevent Comcast from exercising its Cable Act rights.

## COUNT II:
## Declaratory and Injunctive Relief under Tex. Util. Code § 181.102

65. Comcast re-alleges and incorporates by reference Paragraphs 1-64.

66. Tex. Util. Code § 181.102 provides "[i]n an unincorporated area, a person in the business of providing community antenna or cable television service to the public may install and maintain equipment through, across, or over a utility easement, a public road, an alley, or a body of public water in accordance with this subchapter."

67. Comcast is in the business of providing cable television service to the public in the unincorporated areas of Montgomery County. Texas law uses the definition of "cable service" set forth in the Cable Act, which defines "cable service" as "(A) The one-way transmission to

subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service[.]" 47 U.S.C. § 522(6); *see* Tex. Util. Code § 66.002(2) ("'Cable service' is defined as set forth in 47 U.S.C. Section 522(6).").

68. Accordingly, Section 181.102 gives Comcast a right to install and maintain its cable system in public roads and utility easements in the unincorporated areas of Montgomery County.

69. Colton has prevented Comcast from installing and maintaining its cable system in public roads and utility easements in the Development, which is within the unincorporated areas of Montgomery County.

70. First, Colton has prevented Comcast from installing and maintaining its equipment in the joint trench located in the public roads and/or public utility easements outside the Development's residential lots.

71. Second, Colton has restricted Comcast's access to the public roads and utility easements outside the residential lots by using its purported Covenant Easements to refuse to allow Comcast to deploy customer drops across this sixteen-foot moat to a requesting customer's premises. Colton is thus depriving Comcast of its right to use the public roads and utility easements for the purpose unambiguously contemplated by Section 181.102—namely, to install and maintain a cable system that is connected to a customer's premises for the provision of cable service (and other communications services).

72. Third, Colton has directly prevented Comcast from "install[ing] and maintain[ing] equipment through, across, or over a utility easement." Tex. Util. Code § 181.102. By purporting to create a private easement that overlaps with and is coextensive with the utility easements along

the front boundaries of the residential lots, Colton has deprived Comcast of its right to access the utility easement to install and maintain its cable system.

73. Comcast is entitled to a declaratory judgment that its rights under Section 181.102 authorize it to install and maintain its equipment and cable system through the public roads and utility easements and to connect to customer homes from those public roads and utility easements upon a customer's request.

74. Comcast is also entitled to injunctive relief prohibiting Colton from taking any action that would seek to prevent Comcast from exercising its rights under Section 181.102.

## APPLICATION FOR PERMANENT INJUNCTION

75. Comcast re-alleges and incorporates by reference Paragraphs 1-74.

76. Comcast asks that its Application for Permanent Injunction be set for a trial on the merits and, thereafter, that the Court issue a permanent injunction against Colton by which it is enjoined from taking any action to prevent Comcast from constructing its cable system in the rights-of-way and utility easements in the Development, and from connecting its cable system from the rights-of-way and utility easements across Colton's purported Covenant Easements to the premises of customers requesting Comcast's communications services, regardless of whether Colton has entered into a separate agreement granting such access to another provider.

## PRAYER FOR RELIEF

Comcast respectfully requests that the Court:

A. Declare that Comcast is authorized under the Cable Act to construct its cable system in the rights-of-way and utility easements in the Development, and to deploy customer drops connecting its cable system to the premises of customers requesting Comcast's communications services;

B. Declare that Comcast is authorized under Section 181.102 of the Texas Utilities Code to install and maintain its cable system in the public roads and utility easements in the Development, and to deploy customer drops connecting its cable system to the premises of customers requesting Comcast's communications services;

C. Permanently enjoin Colton from taking any action to prevent Comcast from constructing its cable system in the rights-of-way and utility easements and from deploying customer drops connecting its cable system to the premises of customers requesting Comcast's communications services, regardless of whether Colton has entered into a separate agreement granting such access to another provider;

D. Enter judgment in favor of Comcast;

E. Award pre- and post-judgment interest as allowed by law; and

F. Award Comcast all other such relief as the Court deems just and proper.

Dated: November 18, 2025

Respectfully submitted,

/s/ *Bryce L. Callahan*
Bryce L. Callahan
*Attorney-in-Charge*
State Bar No. 24055248
SDTX Bar No. 680539
bcallahan@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
SDTX Bar No. 3631240
lschamel@yettercoleman.com
Daisy R. Gray
State Bar No. 24131349
SDTX Bar No. 3864649
dgray@yettercoleman.com
**YETTER COLEMAN LLP**
811 Main Street, Suite 4100
Houston, Texas 77002
Telephone: (713) 632-8000
Facsimile: (713) 632-8002

*Attorneys for Plaintiff Comcast of Houston, LLC*